[Filed June 18, 1892.]

## JANE SKOTTOWE *v.* THE OREGON SHORT LINE, ETC., RY. CO., AND J. T. MULLEN, ADMR. *v.* THE OREGON SHORT LINE, ETC. RY. CO.

NEGLIGENCE — INJURY — CONTROL OF LOCUS IN QUO — SUBSEQUENT REPAIR.— While evidence of additional precautions or subsequent repair is not competent for the purpose of proving antecedent negligence, it is competent for the purpose of showing that the place where the injury occurred was under the control of the defendant, and he may require the court to restrict such evidence to its legitimate effect by a proper instruction.

COMMON CARRIERS — DEPOTS — APPROACHES.— A corporation performing the duties of a public carrier, is bound to keep its depots, or landing places, and the grounds around them, owned by such corporation, or in its possession, and used in connection therewith, safe and convenient for all persons who have lawful occasion to use them; and it is bound to keep all approaches thereto constructed by it and under its control for the use of persons having lawful occasion to use them, safe and convenient for such use, even though the same be within the limits of the highway or a street.

IDEM — ORDINARY CARE — DANGEROUS PLACE — CONTRIBUTORY NEGLIGENCE.— A public carrier is only bound to use ordinary care in view of the dangers to be apprehended; it is not bound to keep its premises absolutely safe, nor is it liable for accidents due to a want of ordinary care on the part of the injured person.

DEATH OF PARTY — MEASURE OF DAMAGES — EARNING CAPACITY.—Under the statute, the age and sex, the general health and intelligence of the deceased, his habits and capacity, mental and physical, to earn and acquire property, are all to be considered in estimating the damages; and this would include skill in the management of wealth, or capacity to manage affairs which would be of an advantage to an estate, and the loss of which would prove a detriment to it.

Wasco county: W. L. BRADSHAW, Judge.

Defendant appeals.    Affirmed.

*W. W. Cotton, Zera Snow,* and *Wallace McCamant,* for Appellant.

It was error to receive evidence of repair on the bridge after the accident, by rebuilding the panel which was out at the time of the accident. Plaintiff claimed the admission of this evidence on the trial only for the purpose of proving a control in the defendant company of the bridge in question; and it was for this purpose the court permitted the evidence to be received; but the jury were not instructed by the court that the evidence was not to be received for the purpose of proving negligence. Not only was the grade of the employé, who directed the repairs to be made, such as to call for the rejection of the evidence, but, aside from that, its admission was contrary to the well established doctrine that an admission made by an employé or agent after the transaction is inadmissible as evidence against the principal. (*Hudson* v. *C. & N. W. Ry.* 59 Iowa, 581; 44 Am. Rep. 692; *Packet* v. *Clough,* 20 Wall. 528; *Missouri Pacific* v. *Ivy,* 71 Tex. 409; 10 Am. St. Rep. 758; *Howard* v. *Savannah etc. R. R. Co.* Ga. March 21, 1890, 11 S. E. Rep. 452; *Durkee* v. *C. P. R. R. Co.* 69 Cal. 533; 58 Am. Rep. 562; *Luby* v. *Hudson R. R. Co.* 17 N. Y. 131; *Furst* v. *Second Ave. Co.* 72 N. Y. 542; *East Tenn. etc. R. Co.* v. *Maloy,* 77 Ga. 237; *Michigan Central Ry. Co.* v. *Gougar,* 55 Ill. 503; *Worden* v. *Humiston etc. Ry. Co.* 72 Iowa, 201; *Hayward etc. Co.* v. *Duncklee,* 30 Vt. 29; *Randall* v. *Northwestern Telegraph Co.* 54 Wis. 140; 41 Am. Rep. 17; *Goetz* v. *Kansas City Bank,* 119 U. S. 551; *Fogg* v. *Child,* 13 Barb. 246; *Lowry* v. *Harris,* 12 Minn. 255; *Converse* v. *Blumrich,* 14 Mich. 109; 90 Am. Dec. 230; *Whiteside* v. *Margarel,* 51 Ill. 507; *Morse* v. *Minneapolis etc. Co.* 30 Minn. 465; *Terre Haute etc. Co.* v. *Clem,* 123 Ind. 15; 18 Am. St. Rep. 303; *Nalley* v. *Hartford Carpet Co.* 51 Conn. 524; 50 Am. Rep. 47; *Hudson* v. *Chicago etc. Ry. Co.* 59 Iowa, 581; 44 Am. Rep. 692; *Cramer* v. *City of Burlington,* 45 Iowa, 627; *Baird* v. *Daly,* 68 N. Y. 547; *Salters* v. *D. & H. Canal Co.* 3 Hun, 338; *Payne* v. *Troy & Boston R. Co.* 9 Hun, 526; *Dougan* v. *Champlain Transportation Co.* 56 N. Y. 1.)

A common carrier is not an insurer of the safety of persons on their way to its stations for the purpose of taking passage on its trains or boats. (*Pennyslvania Co.* v. *Marion*, 104 Ind. 239; *Moreland* v. *Boston etc. Ry. Co.* 141 Mass. 31; *Indiana Cent. Ry. Co.* v. *Huddleson*, 13 Ind. 325; 74 Am. Dec. 254; *Kelly* v. *Manhattan R. R. Co.* 112 N. Y. 443; *Robbins* v. *Jones*, 15 C. D. (N. S.) 211; *Quimby* v. *Boston etc. R. R. Co.* 69 Me. 340.)

The defendant was not bound to provide a road or way from the business part of the city to its landing place. Indeed, the defendant lacked the power so to do. It had no right to occupy the streets of Dalles City for this purpose. (*Fanning* v. *Osborn*, 41 Hun, 120; *Reed* v. *Richmond etc. R. R. Co.* 33 Am. & Eng. R. R. Cas. 503.) Nor could it condemn private property for the purpose of doing so. (*Witham* v. *Osburn*, 4 Or. 318.)

Plaintiff and deceased, coming as they were to defendant's landing at an unreasonable hour, were mere licensees. A licensee must take premises as he finds them, and the owner is under no obligation, as to him, to keep his ways in repair. (*Cusick* v. *Adams*, 115 N. Y. 55; 12 Am. St. Rep. 772.)

Where an instruction is asked upon a supposed state of facts, the instruction should be given if the evidence is sufficient to support the finding of those facts by the jury. (*Griel* v. *Mark*, 51 Ala. 566; *Flourney* v. *Andrews*, 5 Mo. 513; *Chicago etc. R. R. Co.* v. *Bingenheimer*, 116 Ill. 226; *Peoria etc. Ins. Co.* v. *Anapow*, 45 Ill. 86.)

It is well settled by the weight of authority that a sale of lots or blocks with reference to a given map or plat describing lots or blocks as bounded by streets, will amount to an immediate and irrevocable dedication of streets. (*Carter* v. *Portland*, 4 Or. 339; *Parrish* v. *Stephens*, 1 Or. 60; *Portland* v. *Whittle*, 3 Or. 128; *Cincinnati* v. *White*, 6 Pet. 431; *Wyman* v. *Mayor*, 11 Wend. 486.)

What facts constitute contributory negligence, is a question of law for the court, which cannot be referred to the

jury. (*N. Y. L. E. R. Co.* v. *Enches,* 127 Pa. St. 316; 14 Am. St. Rep. 848; *Carlisle* v. *Sheldon,* 38 Vt. 440.)

In actions founded on a statute such as that in force in Oregon, on which the case at bar was based, the damages recoverable are wholly pecuniary. It must appear that the death of the decedent has been the cause of pecuniary loss to the estate. (*Holmes* v. *O. & C. Ry. Co.* 5 Fed. Rep. 523; *Holland* v. *Brown,* 35 Id. 42; *Serensen* v. *N. P. R. R. Co.* 45 Id. 411; *Pennsylvania Co.* v. *Butler,* 57 Pa. St. 337; *Mansfield Coal & Coke Co.* v. *McEnery,* 91 Pa. St. 189; 36 Am. Rep. 662; *Atchison etc. Ry. Co.* v. *Brown,* 26 Kan. 443.)

Nominal damages are all that are recoverable where the evidence fails to show a probable saving capacity. (*Howard* v. *Del. & Hudson Canal Co.* 40 Fed. Rep. 198.)

*A. S. Bennett,* for Respondent.

While evidence of additional precautions or subsequent repair is not competent for the purpose of proving antecedent negligence, it is competent for the purpose of showing that the place where the injury was received was under the control of defendants. (*Readman* v. *Conway,* 126 Mass. 374; Elliott, Roads and Streets, 650; *Lafayette* v. *Weaver,* 92 Ind. 479; *Manderschid* v. *Dubuque,* 29 Iowa, 87; 4 Am. Rep. 196; *Folsom* v. *Underhill,* 36 Vt. 580.)

Even verbal admissions of an agent subsequent to the transaction in question are admissible when made within the scope of his authority. (*Morse* v. *R. R. Co.* 72 Mass. 450; *Kirkstall* v. *Furness,* L. R. 9 Q. B. 468; *Clifford* v. *Burlon,* 1 Bing. 199.)

A common carrier is liable for negligence in its construction of or failure to repair its station approaches. (Patterson, Railway Accident Law, 253; *Quimby* v. *B. M. Ry. Co.* 69 Me. 341; *C. & N. W. Ry. Co.* v. *Fillmore,* 57 Ill. 265; *Hulbert* v. *N. Y. Cent. Ry. Co.* 40 N. Y. 145; *Hartwig* v. *R. R. Co.* 49 Wis. 358; *Carleton* v. *Franconia,* 99 Mass. 216.)

There is nothing in the claim of defendant that it was exonerated from liability for the bad repair of the elevated walk to its wharf, if it had been shown that such elevated walk was upon a public street or private property. It makes no difference upon whose land such walk was situated. If it was constructed and controlled by the defendant, it is liable. (*Tobin* v. *Portland Ry. Co.* 59 Me. 188; *Quimby* v. *Ry. Co.* 69 Me. 340.)

LORD, J.—These actions are brought by Jane Skottowe, in the one case, and by J. T. Mullen, as administrator of the estate of Nicholas Skottowe, in the other case, against the defendant, to recover damages resulting from a fall by Jane Skottowe and her deceased husband from an elevated way leading from Dalles City to the defendant's boat landing, which fall caused serious injury to Jane Skottowe, and the death of her husband. The liability of the defendant is predicated on the ground that the defendant was negligent in failing to keep in repair the elevated way, or bridge, from which the plaintiff and the deceased fell, and were injured, and in failing to provide such place with proper lights. The answer of the defendant put in issue all the material allegations of the complaint, and further alleged that the elevated way, or bridge, causing the injury and death, was not the property or in the possession or under the control of the defendant, and as a separate defense, that the plaintiff and her deceased husband were guilty of contributory negligence.

The facts are substantially these: The plaintiff and her deceased husband were citizens of Ireland, traveling in this country with the double purpose of visiting a son, who resided in the state of Wyoming, and such places as would interest them or contribute to their pleasure. It would seem that they had secured a round-trip ticket from Portland to The Dalles and return, and that they had come up to The Dalles by railroad with the intention of returning

to Portland by the river on one of the boats of the defendant, for the purpose of obtaining a more complete view of the Columbia river scenery. The boats of the defendant were fitted up with state-rooms and other adjuncts for the comfort and accommodation of its passengers. As the hour at which the defendant's boats were accustomed to leave in the morning was early,— seven o'clock,— the company, for its own advantage, and for the convenience of its passengers, allowed them to come on board of its boats at night and to sleep there. For this accommodation the defendant charged and received a specified consideration, and by reason of it, its passengers were saved from the necessity of arising at an inconvenient hour in the morning in order to reach the boat. The plaintiff and her husband reached The Dalles some time about the middle of the day, and during the afternoon went down to the wharf boat, as it would seem, for the purpose of acquainting themselves with the way to the boat's landing, and ascertaining what arrangements were necessary to be made to get on board of the boat. The agent of the defendant informed them at the office that they could come on board of the boat that night, as soon as it came in, and sleep there until morning, so that they would be on the boat at its hour of starting.

Concluding to avail themselves of this accommodation, they returned up town; and after getting a meal at a restaurant, and walking and looking around until the time had come for the boat to arrive, they started down to its landing. It was after dark when the defendant's boat came in, but owing to the fact that it had a barge in tow, it proceeded up the river, under slow bells, past its landing place, to a point on the river about opposite the place where the accident occurred, for the purpose of landing the barge, when it turned back to make its landing. Her lights were lit; and it was while some of these things were occurring that the accident happened. The landing place of the defendant's boat is some distance below the inhabited por-

tion of The Dalles, and is reached by a long elevated incline and narrow roadway which passes over Mill creek by means of a bridge. One portion of this roadway, at the point where it leaves the inhabited portion of The Dalles, is occupied by the defendant's railroad tracks, and leads to its shops, while the other portion of it gradually inclines and leads to its wharf or boat landing. These two ways at the point where the injury occurred are connected and rest on the same timbers. The situation is difficult to describe, but it is shown on the photographic exhibits. These different ways were originally built by the O. S. N. Co., the defendant's predecessor in interest, for the purpose specified, and since then have been constantly used as a means of access to and from its shops and the landing place of its boats. At different times the company has rebuilt and repaired this roadway, raised and changed it, and exercised various acts of control over it. The place where the accident occurred, and over which the elevated roadway or bridge crosses Mill creek, is a short distance below the last building in the inhabited portion of the city. The land under the bridge was doubtless a public street at the point of the accident, as it seems to have been platted as such, but the city has never opened it as a street, nor exercised any control or ownership over the elevated roadway or bridge. "There was no evidence," the record says, "in the case tending to show that Dalles City, or any one, except the railroad company and its predecessors in interest, had exercised any control of the bridge at the place where the accident occurred, or had ever operated or repaired the same." The bridge is from twelve to twenty feet from the ground, which is of a rocky and uneven character, and along the bridge there has always been a rail running, which a short while before the accident got loose and came off and never was replaced until after the injury occurred.

The circumstances of the fall from the bridge are thus related by the plaintiff: "We had passed the town and

got to the way leading to the boat, it being then nearly dark. We suddenly fell down a height. The fall rendered me unconscious. I was aroused by my husband's calls for help. I became unconscious again, and then got conscious again when the men came to carry me up from where I had fallen. Shortly before the accident, we remarked to each other on the want of light. We were feeling our way cautiously along immediately before the accident. My husband's calls for help at the place of the accident was the first thing I knew after the accident, while we were lying on the stones near the river." The injuries to the husband of the plaintiff were of such a character as to cause his death a day or two afterwards. The injury to the plaintiff confined her to bed for many months, and, the evidence indicates, will perhaps render her subject to much suffering and a cripple for the remainder of her life. From these facts and circumstances, it seems evident that the plaintiff and her deceased husband, while passing over the bridge, or elevated roadway, seeing out in the river the boat, which was lighted up, and supposing that they had reached the landing, walked through the opening occasioned by the want of railing, and were precipitated upon the rocks below.

Upon this state of facts, the most vital point of contention for the defendant is, that the duty of a passenger-carrier to provide reasonably safe approaches to a landing place, or station, is confined only to the immediate vicinity of its landing or station, and to approaches on its own ground or right of way, and that, as the facts show that the land over which the bridge was constructed, and where the accident occurred, was a public street, the defendant was under no obligation to keep such bridge in repair or properly lighted. There are other questions connected with this upon which error is alleged. and to which we shall advert at the proper time.

There is, however, a preliminary question upon the evidence, to which an exception was taken, that must be first disposed of.    One Mr. Allen was called as a witness for the plaintiff, and testified that he was in the employ of the defendant, and engaged in carpenter work; that about two days after the accident he repaired the bridge by replacing the missing railing.    He was then asked the question: "Under whose direction?"    To this question the defendant objected as incompetent and immaterial; whereupon plaintiff's counsel stated in open court and in the presence of the jury that he did not offer the testimony for the purpose of showing negligence, but for the purpose of showing acts of ownership and control over the bridge, and the court ruled that the evidence should be received for that purpose, and for that purpose only.    The witness then answered that he was instructed by Mr. De Huff, the company's foreman, or superintendent, at the shops.    It is conceded that this evidence is hardly sufficient to show that Mr. De Huff had authority from the railroad company to make the repair in question, but no proper means were taken to get rid of this aspect of it.    As already disclosed, this evidence was offered for the purpose of showing that the bridge, or place where the injury was received, was under the control of the defendant.    As applicable to this object, no objection is made, if the evidence shall be restricted exclusively to this purpose.    It is not the fact that repairs were actually made by the defendant, or the inference of control or ownership sought to be drawn, to which objection is urged, but that such evidence is inadmissible for that purpose, unless the jury were instructed or expressly cautioned by the court, when it was received, that it could not be considered by them on the question of negligence.    Counsel for the plaintiff stated that the evidence upon objection was only offered to prove the control of the defendant over the place of injury, and not to prove negligence, and the court ruled in the presence of the jury that it would only be admitted for

the purpose of showing control. Notwithstanding this, however, it was argued that this statement and ruling were not enough to remove the objection for incompetency, unless the court went further when the evidence was received and instructed or cautioned the jury that they could not take it into consideration upon the question of negligence on the part of the defendant; otherwise the jury would be authorized to consider such evidence as proof of negligence, or to treat it as a link in the chain of such proof, contrary to the well established rule that evidence of subsequent repairs is not competent for the purpose of proving antecedent negligence. That this rule is now to be regarded as settled law in a proper case is not controverted, as the authorities in support of it fully indicate. (*Morse* v. *Minn. etc. Co.* 30 Minn. 465; *Terre Haute etc. R. R. Co.* v. *Clem*, 123 Ind. 15; 18 Am. St. Rep. 303; *Nally* v. *Hartford Carpet Co.* 51 Conn. 524; 50 Am. Rep. 47; *Hudson* v. *Chicago & N. R. R. Co.* 59 Iowa, 581; 44 Am. Rep. 692.) The principle seems equally as well established that, while evidence of additional precautions or subsequent repair is not competent for the purpose of proving antecedent negligence, it is competent for the purposes of showing that the place where the injury was received was under the control of the defendant, who may require the court, if he choose, to restrict it to that point by a proper instruction. As the court said, in *City of Lafayette* v. *Weaver et al.* 92 Ind. 479, such evidence "was not admissible to prove negligence on the part of the city, the question as to which was to be determined by what was known before and at the time of the accident, but it was evidence of the city's recognition of the defect in the sidewalk as one which the city was bound to repair, and was admissible for such purpose. * * * By proper request, the appellant could, through an instruction, cause the restriction of the evidence to its legitimate effect." (Elliott on Roads and Streets, 650.)

Independent of these considerations, we do not think there was any liability of the jury considering the evi-

440　　　　Skottowe v. O. S. L. etc. Ry. Co.　　[Sup. Ct.

Opinion of the court—Lord, J.

dence for any other purpose than showing control or authority over the *locus in quo*, as the circumstances under which it was admitted expressly restricted it to this purpose, and exclude the idea of its being admitted to prove negligence. So that, as the exception stands, while we agree that such evidence is and ought to be regarded under any circumstances as incompetent as an admission of neg-ligence, we do not understand it is incompetent to show authority over the *locus in quo*, or control over the place where the injury occurred. If the evidence was competent for this purpose, there was no other defect, except possibly to show the authority of De Huff to order the repairs— his agency to connect the company with the making of the repairs; but this was regarded as of no consequence and merited little attention of counsel, for the reason, doubtless, that there was other evidence, before the accident, indicative of the defendant's control over the place of the injury, or recognition of its duty to keep the bridge in good condition and repair, such as the construction and repair of the bridge, and the exclusive use of it as a means of access to its boat landing. Moreover, as the question was asked, the answer might have been that the repair of the bridge was directed to be done by the representative of the defendant, so far as the court could know, but if the answer did not sufficiently connect the company,—turned out to be improper,—it was the duty of the defendant claiming to be injured by it to move to strike it out. Still, if we thought the evidence was incompetent, as the case stands, in view of its importance and liability to arise frequently in the trial court, we should hesitate to excuse the error, solely because no motion was made to strike it out.

The next alleged error is the refusal of the trial court to direct a verdict for the defendant. The contention is, that the undisputed evidence shows no liability upon the part of the defendant. This is based on the assumption that the undisputed evidence shows that the elevated walk or bridge

to the boat landing of the defendant is upon a public street, and as a consequence, neither the defendant nor its predecessors had any right to occupy the street by a bridge for this purpose, and that even if they did so originally, by constructing and subsequently by keeping it in repair, it was a voluntary act, and placed the defendant under no obligation to keep it in repair, or liability for want of repair. As the question involved is important and vital, as affecting the liability of the defendant, it deserves to receive, despite the pressure of our duties, our best consideration. At the risk, therefore, of some repetition of the facts already stated, but to make more clear, if possible, the relation of the defendant to the *locus in quo*, as a part of its means of approach to its boat landing, and the relation of the city to it, as showing its control over it, we quote from the bill of exceptions the following facts: "Plaintiff also called as witnesses, John Cates, R. A. Roscoe, and George H. Knaggs, whose evidence tended to show that the bridge in question, from which it is claimed that the fall occurred, was constructed by the Oregon Steam Navigation Company, a transportation company engaged in operating boats and portage roads from The Dalles on the Columbia river; that the Oregon Railway & Navigation Company succeeded to the Oregon Steam Navigation Company; and further tended to show that the Oregon Railway & Navigation Company continued to operate and control the bridge until their railroad and boat line was leased to the defendant as shown herein, and that the bridge in question was the bridge extending on from Main street in Dalles City across a ravine through which Mill creek runs, and leading to the lower boat landing used by the Oregon Railway & Navigation Company as a landing for the boats operated by them on the Columbia river; that it was such bridge leading to such landing at the time of the lease; and since then it had been used by the present company in operating boats on said river as a means of access to and from the town of The

Dalles and the boat landing.   The evidence further tended
to show that the bridge had been raised once or twice by the
Oregon Railway & Navigation Company and the defendant
company, and that the defendant company had exercised
acts of control over the bridge in keeping the same up and
preventing it from being floated away by high water; and
by means of the route over this bridge it was the only route
to the lower boat landing; and no other person or persons
had had anything to do with the control of said bridge or
keeping it in repair from the time it was built up to the
time of the injury to the plaintiff.   The evidence of these
witnesses also tended to show that there was no business
other than that connected with the defendant company's
business west of the bridge in question which would take
persons thereover, and that the bridge was used only by
persons having business with the defendant company, and
that it was used by such persons in traveling to and from
its wharf for the purpose of traveling over its line and in
shipping and receiving freight.   The testimony of these
witnesses further tended to show that one side of the bridge
in question was a railroad bridge, used exclusively by the
defendant as a means of access to its shops and round-
houses, the other portion of the same being a narrow plank
roadway, used as a means of access to and from its boat
line and wharves, with the two ways separated and deflected
from each other some distance west of the place where
plaintiff was injured."

In view of these facts, it is important to ascertain the
duties of the defendant as a public carrier to keep all the
approaches to their boat-landing, or depot, owned by them,
or constructed by them, and under their control, or in their
possession, and used in connection therewith, safe and con-
venient for the use of its patrons, or those who have lawful
occasion to use them.   DILLON, C J., laid down the rule, as
founded upon reason and authority, that "railroads are
bound to keep in a safe condition all portions of their

platforms, and approaches thereto, to which the public do or would naturally resort, all portions of their station-ground reasonably near to the platforms, where passengers or those who have purchased tickets with a view to passage on their cars would naturally ordinarily go." (*McDonald* v. *Chicago etc. R. R. Co.* 26 Iowa, 145; 96 Am. Dec. 114.)

Such corporations are not only bound to keep their platforms and landing places safe and convenient for all who make use of their cars or boats as a means of conveyance, but they are bound to make the approaches over their own premises, or premises in their possession and used in connection therewith, safe and convenient for passengers. The liability for the non-performance of this duty by such corporations is founded on the general principle that a person injured without neglect on his part by a defect or obstruction in a way or passage over which he has been induced to pass, for a lawful purpose, by an invitation, express or implied, can recover damages for the injury sustained against the individual so inviting and being in default for the defect. (*Barrett* v. *Black*, 56 Me. 498; 96 Am. Dec. 497; *Carleton* v. *Franconia Iron Co.* 99 Mass. 216.)

This principle finds its illustration in *Tobin* v. *S. & P. R. R. Co.* 59 Me. 183; 8 Am. Rep. 415. There, a hackman, while carrying a passenger to the depot for transportation, stepped without fault into a cavity in the platform and was injured; and it was held that the company was liable, and that the liability was the same notwithstanding the platform was within the limits of the highway. The court, after stating that it was the duty of such corporations to make the approaches to their depots safe and convenient, and likewise to so keep their platforms and landing-places, not only for those who are passengers, but for all who have rightful occasion to use them, says: "It is objected that the defendant built the platform within the limits of the public highway; but it is no answer to the plaintiff, when seeking compensation for the consequences of their neglect, that they have tres-

passed upon the rights of the public. They have built the platform and used it. Their passengers and those having rightful occasion to be upon it, are there by their invitation, and they are responsible for its condition. It may be that the city of Portland might be liable for a nuisance within the limits of their public highways, erected and maintained by the defendant corporation; but, if so, the city has the right of reclamation against those creating the nuisance. Much more, then, could the party injured maintain his action directly against the corporation causing the injury." In *Quimby* v. *B. & M. R. R. Co.* 69 Me. 340, these principles are reässerted, but the fact that the sidewalk where the injury occurred was not in the possession and control of the defendant as one of the approaches to their station, defeated a recovery. The court says: "A railroad corporation is bound to keep its depot and the grounds around it owned by the corporation, or in its possession and used in connection with it, safe and convenient for persons who have lawful occasion to use them. It is bound to keep all approaches to its depot, constructed by it and under its control, for the use of persons having lawful occasion to use them, to go to or from its depot or cars, safe and convenient for such use, even though the same may be within the limits of the highway. The burden was on the plaintiff to show that the walk where he received his injury was constructed by the defendants, and was in their possession and control as one of the approaches to their station." The court then proceeds to state the facts, showing that the sidewalk was not in the possession of the defendant, but that the city had resumed control of it, and kept it in repair, and as a consequence, that the defendant corporation was not liable.

The court further says: "Upon this state of facts, we think it clear that the defendants were under no obligation to keep the sidewalk in repair. It was no part of their bridge. It was a part of the public street under control

of the city.   The defendants had no right to enter upon it
to make any changes or repairs.   Their liability ceased
when they restored the condition of the sidewalk to the
acceptance of the city."   This case is cited by the defend-
ant, but the principle it declares and recognizes is fatal to
its contention.   Mr. Hutchinson says:   "It is the duty of
the carrier to provide a reasonably safe means of getting to
and from the station, and it will be liable for an injury
resulting from its failure so to do.   And if passengers,
habitually, naturally, and with the acquiescence of the
carrier, adopt a certain route, especially a route pointed
out by the customs and methods of the carrier, it is the
duty of the latter to take reasonable precautions to so
guard and maintain it that passengers will not thereby
suffer injury.   It is immaterial in this respect, whether the
carrier furnished the route or provided or constructed the
means of passage or not.   If, with full knowledge of the
facts, it permits an unsafe and dangerous means to be pro-
vided and used, it is as much liable for an injury arising
therefrom as though it had itself set up and maintained
a dangerous way.   The same rules apply to carriers by water,
who are liable for furnishing dangerous gangplanks for use by
passengers."   (Hutchison, Carr. 2 ed. § 519; *Cross* v. *Railway
Co.* 69 Mich. 363; 13 Am. St. Rep. 399; *Hoffman* v. *R. R. Co.*
75 N. Y. 605; *Green* v. *Pa. Ry. Co.* 36 Fed. Rep. 66; *Texas Ry.
Co.* v. *Orr*, 46 Ark. 182; *Wallace* v. *R. R. Co.* Del. Dec. 13,
1889, 18 Atl. Rep. 818; *Collins* v. *R. R. Co.* 80 Mich. 390.)

Plainly, then, it is the duty of such corporations to pro-
vide reasonable accommodations at their stations and land-
ing places; to keep in safe condition all portions of their
platform and approaches thereto, and furnish safe and
proper means of ingress and egress therefrom, even though
some part of it may be constructed upon a highway, if the
same be in their possession or under their control and used
in connection with them.   This duty and the liability of
such corporations for its non-performance, when an injury

occurs, in respect to such places, platforms, and approaches, as well as to furnish lights, is also fully stated, and the cases maintaining it, collected in 30 Am. & Eng. R. R. Cas. 555n.

But by this it is not meant that such companies are bound to keep their premises absolutely safe, or that they are liable for accidents due to want of ordinary care on the part of the injured person. They are only bound to exercise ordinary care in view of the dangers to be apprehended. The distinction between such liability for an injury to a passenger occurring on their cars or boats, and for an injury occurring on their platforms or approaches to the station or landing places, is well recognized. (*Pennsylvania Co.* v. *Marion*, 104 Ind. 239; *Moreland* v. *Boston etc. Ry. Co.* 141 Mass. 31; *Kelly* v. *Man. Ry. Co.* 443.)

Nor is there any claim that the defendant is an insurer, but that it was bound to use ordinary care to keep its approaches to its boat landing safe and convenient; and that to leave a railing off of a bridge of this kind, at such a place, and at such a height from the ground, for a period of several weeks, was a want of ordinary care if not gross negligence. Nor do the cases cited by the defendant conflict with these principles, as declared by the authorities, or support its contention. It will be sufficient to notice those claimed to be most in point.

In *Eisenberg* v. *Mo. Pac. Ry. Co.* 33 Mo. App. 91, it did not appear that the road had been built by the defendant and held out to its patrons as a way to its depot. There was another and safer road, and the exact situation of the defect was known to the plaintiff. The only element in the case is that prior to the accident the company had improved it; but, upon plaintiff's own testimony, the case was void of all elements of negligence upon the part of the defendant. The court says: "In the case at bar, the danger was neither a hidden nor recent danger. The excavation existed before the road was built. The plaintiff knew the exact situation for years; his drivers knew it. This very driver had trav-

eled over the road repeatedly on the day of the accident. He discussed such dangers, when they were in full view in broad daylight, with his fellow-servant; and knowing what risk he undertook, voluntarily assumed it, although he might have used another and safer road." It was a clear case of contributory negligence. In *Cusick* v. *Adams,* 115 N. Y. 55; 12 Am. St. Rep. 772, the bridge was built for the convenience of the defendant. The plaintiff was a stranger to him, and to whom he owed no duty; nor was the plaintiff upon the bridge upon the defendant's invitation, nor to do any business with him, but for the purpose of seeing a shooting match upon an island with which the defendant had no connection whatever. In *Texas etc. Ry. Co.* v. *Dessommes,* Tex. March 3, 1891, 15 S. W. Rep. 806, the testimony was so positive and definite that the defendant had nothing whatever to do with the crossing at the place of the injury, that the verdict was held contrary to the evidence. There is no relevancy in these cases, or the others cited, to the case at bar.

Nor is there anything in the fact, if it be admitted, that the land where this bridge was constructed and maintained by the defendant was platted as one of the public streets; it by no means follows that the city was bound to open the same to public travel. As THAYER, C. J., after showing that the dedication of streets by maps and plats was irrevocable and vested them in the public, said: "But it does not follow that the city is under any obligation to open and improve such streets at once; they may be allowed to remain dormant until their use becomes a public necessity." (*Meier* v. *Portland Cable Co.* 16 Or. 500.) There is no pretense or evidence to show that the city had opened this street beyond its inhabited portion. The evidence is undisputed that the defendant built the bridge partly upon it for its own purposes, and has ever since used it exclusively as a railroad bridge and as a way to its boats. The city had nothing to do with it. "There was no business other than that connected with the defendant company's business west

of the bridge in question, which would take persons there-over, and it was used only by persons having business with the defendant company in traveling to and from its wharf for the purpose of traveling over its line and in shipping and receiving freight." So runs the record.

Nor do we think there is anything in the contention that the defendant is not liable, because the plaintiff and her husband started to go on the boat in the evening instead of in the morning. It was the custom of the defendant to receive passengers on its boats in the evening, and allow them to sleep there, for which they were charged extra, or "fifty cents for single berths and six bits for double." Its officers at the wharf boat informed the plaintiff and her husband of the custom, and they were going to the boat to avail themselves of it when the injury occurred. By so doing, the defendant invited its patrons to take passage on its boats in the evening instead of in the morning, and was bound to make its approaches safe for the travel of such persons as it was for persons who came on board in the morning. We think there was no error.

It is next objected that the court erred in declining to instruct the jury that the platting of the ground under the bridge in question as a public street and selling lots by reference to the same, constituted a dedication of the street. This objection is embraced in five long instructions out of the numerous instructions asked, and are justly subject to the criticism suggested by counsel. The proposition itself was not disputed as a matter of law, nor was the refusal of the court to give the instructions asked in conflict with it. It was the fact that the instructions ignored the distinction between the dedication of a street and the opening of that street as a public highway, by which the defendant sought to excuse liability, that caused the court to refuse them. But the view we have taken renders their further consideration unnecessary. The evidence shows that the street was not opened by the city, nor used by it, but that it was

exclusively occupied by the defendant with its bridge as a
means of access to its boat landing, and under its control
at the time of the accident.

It is next objected that the trial court erred in refusing
and modifying instruction number sixteen upon the ques-
tion of contributory negligence.   This instruction is objec-
tionable, but instruction number thirty-nine, as given by the
court, better states the law as applicable to the facts.   There
can be no doubt but the bridge was a place where a rail-
ing or guard on it was necessary at all times, but especially
after dark, when passengers were expected to travel over
it to and from the landing place.   The plaintiff and her
husband were strangers, and the circumstances already
stated were not such as the court could declare contributory
negligence.

The next objection is, that "the court erred in instruct-
ing the jury that the defendant was bound to keep its
approaches safe and well lighted at all hours of night,
regardless of the time set for the departure of its boats."
This refers to the court declining to give certain instruc-
tions asked by the defendant, and giving certain others
asked by the plaintiff.   By the instructions thus given and
refused, it is claimed that the court imposed upon the
defendant the duty to keep the approaches, or bridge con-
structed by it, and under its control, leading to its steam-
boat landing, in such order and repair and so well lighted
as to be reasonably safe at all hours of night.   The com-
plaint is, that this laid the duty on the defendant regard-
less of the time and of the fact that the boat did not leave
until the next morning.   Upon this point, the instruction
given by the court was:   "If the defendant had been in
the habit of and accustomed to take passengers on the
boat in the evening and permitting them to sleep thereon,
then its liabilities as to a passenger passing over its walks
and ways in the evening for such purpose, would be just
the same, and its duties as to keeping its ways to its boat

XXII Or.—29.

would be just the same as it would toward a passenger going to the boat at the hour of starting in the morning." The court did not, therefore, instruct the jury that the defendant was bound to keep its approaches safe and well lighted at all hours of night. The plaintiff and her husband were going down to the boat, as the evidence indicates, between six and eight o'clock in the evening. It was the usual time when the defendant was in the habit of receiving passengers; they were invited to come on board, and they had a right to be there; they were going there to do business with the defendant,—to sleep on board of the boat all night, and pay them for the accommodation. The benefit was mutual. It was not a gratuitous privilege for their own special convenience. The boat was just coming into its landing, and the time was in the evening and appropriate. There is no claim, nor can there be on the facts, that it was the duty of the defendant to keep its approaches to its landing safe at all hours of the night, but that it was its duty in the evening, when it was accustomed to receive passengers. Whether it was the duty of the defendant to keep them in that condition at other later hours in the night, was a matter with which the plaintiff in this case has no concern.

It is next objected that the damages awarded are excessive. The damages assessed by the jury are large. The evidence tends to indicate that the plaintiff is permanently injured. "I think," says the medical witness, "that if she does regain the use of her limb and it becomes free from pain, it will be several years. It will take a long time to fully recover, if she ever does." She is unable now to stand without support, and altogether unable to walk, and still suffers great physical pain from the injury. The probabilities are that she will be a cripple during her life, and subject to much pain and suffering. In such case, different individuals would vary in their estimate of the sum which would be a just pecuniary compensation. "It

is one thing," said Mr. Justice Story, "for a court to administer its own measure of damages in a case properly before it, and quite another thing to set aside the verdict of a jury, because it exceeds that measure." (*Thurston v. Martin,* 5 Mas. 499.)   Nor is the fact to be overlooked that the judge who heard the testimony, in refusing the motion for a new trial, approved the verdict of the jury.   In such case, it has not been the practice of this court to interfere, nor if such was the practice, are the damages given so excessive as to justify our interference.   Many larger verdicts for less injuries have been sustained by the courts.

Thus far the cases have been considered together, but the point is made in the administrator case that no earning power was proven on the part of the deceased.   This is based on the inference that the deceased was a wealthy man, living on his income.   Under the statute, the age and sex, the general health and intelligence of the deceased, his habits and capacity, mental and physical, to earn and acquire property, are all to be considered.   The deprivation of his affection and society cannot be taken into account.   This would include skill in the management of wealth, or capacity to manage affairs, which would be of advantage to an estate, and the loss of which would prove a detriment to it.

In view of all the circumstances, we are unable to say there was error, and must affirm the judgments, or judgment in both cases.